UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 08-92-P-H |
| | ) | |
| CHARLES SMALL, JR., | ) | |
|     a/k/a Kelly Small, | ) | |
| | ) | |
|         Defendant | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

The defendant, Charles Small, Jr., a/k/a/ Kelly Small, charged in a complaint with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1)), Complaint (Docket No. 1), moves to suppress the two firearms that form the basis of the charge against him. Motion to Suppress Evidence ("Motion") (Docket No. 51) at 1. An evidentiary hearing was held before me on September 16, 2008, at which the defendant was present with his attorney. Two witnesses were called by the government. The defendant called no witnesses. No exhibits were offered. I now recommend that the court adopt the following proposed findings of fact and that the motion be denied.

**I. Proposed Findings of Fact**

John MacDonald, a Maine state game warden assigned to the Freeport district, first became familiar with the defendant about a year before the events giving rise to this case. On November 5, 2007, Jeremy Warren Judd, a Maine state game warden since February 2003 and then assigned to the towns of Falmouth, Yarmouth, North Yarmouth, Cumberland, Gray, and New Gloucester, received a report of an escaped domestic red deer at large in North Yarmouth. The owner told Judd that he believed that a hunter named Charles Small had cut the gate to allow

1

the deer to escape; other residents of the area told Judd the same thing. Judd was familiar with Charles Small, the defendant herein, because a few years before these events, the Maine State Police had contacted Judd while trying to locate Small. Judd called MacDonald and they decided to work together on the case. They both knew that the defendant was a convicted felon and thus a person prohibited from possessing firearms. Judd also confirmed the defendant's status as a convicted felon through the Maine State Police.

On November 21, 2007, at around 2:00 p.m., Judd found the defendant's truck, a 1990 blue and white Chevrolet pickup truck with a cap, parked at the end of Sweetser Road in North Yarmouth, in an area popular with hunters. He called MacDonald, who came to the scene. The truck was parked on a dirt road in front of the gate to property owned by the water district. The area behind the gate was wooded. Across the road from the gate was a field, beyond which was another wooded area. MacDonald "ran" the license plate of the truck and confirmed that it was registered to the defendant.

The two wardens approached the defendant's truck in Judd's warden service vehicle. They looked around the area, looked for tracks leading away from the defendant's truck, and looked into the truck through its windows. Under the cap, they saw a bow case and hunting apparel in the bed of the truck. In the cab of the truck, they saw a gun case marked "TC" on the floor in front of the passenger seat; MacDonald knew this to be a case for a Thompson Contender, a handgun that some people use for hunting. They did not see any firearms in the truck. They then looked for a place to conceal Judd's truck while they watched the defendant's truck. After one false start, they concealed themselves about 200 yards away from the defendant's truck. By this time it was about 3:30 p.m.

About 10 to 15 minutes later, MacDonald saw two people dressed in hunter orange emerge from the woods and head toward the defendant's truck. From that distance, he could not determine the gender of the two or otherwise identify them, nor could he see anything in their hands. The tall grass in the field obscured their hands somewhat. MacDonald drove Judd's truck toward the defendant's truck, which required him to make a sharp right turn, breaking eye-contact for some period of time. He stopped 25 to 30 feet from the defendant's truck.

When the wardens arrived at the defendant's truck, the defendant was standing just inside the open door on the driver's side; his minor son was either standing outside the open passenger door of the truck or sitting on the passenger seat. MacDonald and Judd both recognized the defendant, but after they identified themselves as game wardens, Judd asked for identification. The defendant showed him a hunting license in his name. The wardens could see two firearms in the cab of the truck. Both were rifles with their barrels on the floorboards and their butts on the seats, one immediately to the right of the space where the driver would sit and the other near where a single passenger would sit. The defendant was standing within three feet of one of the rifles. Judd asked the defendant to move to the front of the defendant's truck and remove his jacket. The defendant did so; he was cooperative at all times. Judd then handcuffed the defendant and told him that he was under arrest as a felon in possession of a firearm. The defendant was placed in Judd's vehicle.

At some point after he was arrested, the defendant said that the firearms were not his and that he had not been hunting with them but rather just accompanying his son, who was 10 or 11 years old. He also suggested that someone might have come to his truck and put the guns there.

The wardens called the Maine State Police for assistance, and Trooper Lucas Hare subsequently arrived at the scene. In the meantime, MacDonald called a woman, believed to be

the defendant's girlfriend, whose telephone number the defendant had given him, to ask her to come to the scene and pick up the defendant's minor son. At the defendant's request, the wardens agreed to wait to transport him to the Cumberland County Jail until the woman arrived to pick up his son. As the defendant left, or shortly before, Judd searched the cab of the defendant's truck and found an unloaded 12-gauge shotgun on the driver's side of the bench seat, a loaded 12-gauge shotgun on the passenger's side of the bench seat, and an unloaded bolt action rifle behind the seat, along with ammunition for all three.

Judd had binoculars with him, as he always carries them in his warden service vehicle. MacDonald was not sure whether he had binoculars with him. Neither warden saw the defendant or his son open the doors of the defendant's truck.

## II. Discussion

The defendant contends that the wardens lacked probable cause to search his truck because they did not see the individuals dressed in hunter orange carrying any firearms. Motion at 4. The government responds that the wardens had probable cause to arrest the defendant for constructive possession of a firearm and that the search was validly conducted incident to that arrest. Government's Objection to Defendant's Motion to Suppress (Docket No. 57) at [2]-[3].

There can be no question that the wardens had probable cause to arrest the defendant for constructive possession of a firearm by a felon regardless of what they saw before they encountered him. Clearly, standing inside the open driver's side door of his truck, the defendant was the driver of his truck, since the only other person in his vicinity, a 10 or 11 year old boy, could not possibly have been. The defendant, known to the wardens to be a felon prohibited from possessing firearms, was standing within three feet of a shotgun which could have been loaded. Additionally, the facts known to the wardens when they earlier approached the

defendant's truck in a public area gave them sufficient reason to do so and to "stake out" the truck in order to see whether the defendant returned to it in possession of a prohibited firearm.

"Law enforcement officers may effect warrantless arrests provided that they have probable cause to believe that the suspect has committed or is committing a crime." *United States v. Martinez-Molina*, 64 F.3d 719, 726 (1st Cir. 1995). The government need only show that "at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." *Id.* "Probable cause is to be determined based on the collective knowledge and information of all the officers involved." *United States v. Bizier*, 111 F.3d 214, 217 (1st Cir. 1997) (citation and internal quotation marks omitted).

The crime of possession of a firearm by a felon includes constructive possession. *United States v. Diaz*, 519 F.3d 56, 66 (1st Cir. 2008). "Constructive possession is proven by demonstrating that [the defendant] knowingly had the power and intention at a given time of exercising dominion and control over a firearm directly or through others." *United States v. Sanchez-Badillo*, __ F.3d __, 2008 WL 3916465 (1st Cir. Aug. 27, 2008), at *5 (citation and internal punctuation omitted). It is sufficient to establish constructive possession of a firearm that the gun was found on the bench seat of a pickup truck in which the defendant was a passenger. *Id.* Accordingly, it is all the more sufficient that the firearm in this case was on the bench seat of the truck within three feet of the owner and driver of the truck.

Next, the question is whether Judd conducted a proper search of the truck incident to the arrest of the defendant. The question is not, strictly speaking, whether he had probable cause to conduct a warrantless search for the guns that were in plain sight, but rather, as the government contends, whether he had the authority to conduct the search incident to the arrest. This is a

recognized exception to the legal requirement that a warrant be issued before a search takes place. *Texas v. Brown*, 460 U.S. 730, 735-36 (1983). The "plain view" doctrine, although not invoked by the government, is also applicable in this case. *See id*. The wardens did not violate the law by placing themselves in a position from which they could clearly see the two guns that are the subject of the defendant's motion, nor does the defendant argue otherwise. *Id*.

A search incident to arrest may be conducted of the area within a vehicle reasonably accessible to the defendant at the time of the arrest, even if at the time of the search he is under physical restraint and at some distance from the vehicle searched. *United States v. Doward*, 41 F.3d 789, 791-93 & n.1 (1st Cir. 1994). That is precisely what happened in this case after the defendant was handcuffed. No legal infirmity arose as a result.

### III. Conclusion

For the foregoing reasons, I recommend that the findings of fact proposed herein be adopted and that the defendant's motion to suppress be **DENIED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 19th day of September, 2008.

/s/  John H. Rich III  
John H. Rich III  
United States Magistrate Judge